IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | CRIMINAL ACTION FILE<br>NO. 4:12-CR-00023-RLV-WEJ |
| JOSEPH MONROE WILSON,<br>     Defendant. | |

## NON-FINAL REPORT AND RECOMMENDATION

This matter is before the Court on a Motion to Suppress Statements [19] filed by the defendant, Joseph Monroe Wilson. The Court conducted an evidentiary hearing on said Motion on January 29, 2013, which has been transcribed [55] (hereafter "Tr."). On the basis of the testimony and documentary evidence produced at the hearing and the briefs of counsel,[1] the undersigned **REPORTS** that law enforcement officers here complied with the dictates of Miranda v. Arizona, 384 U.S. 436 (1966), and that the defendant voluntarily made self-incriminating statements. Therefore, the undersigned **RECOMMENDS** that the defendant's Motion to Suppress Statements be **DENIED**.

---

[1] See Joseph Monroe Wilson's Initial Brief in Support of Motion to Suppress [59] (hereafter "Def.'s Br."), and Government's Response to Defendant's Motion to Suppress Statements [60] (hereafter "Gov't Resp.").

## I.    STATEMENT OF FACTS

On March 26, 2012, at approximately 6:00 a.m., United States Postal Inspection Service ("USPIS") Agent Jeff Adkins, along with seven other law enforcement officers,[2] executed a federal search warrant at the defendant's home, which is located at 116 Mary Lane, Dallas, Georgia. (Tr. 10-11, 29, 31-32, 36.) All of the officers (except the forensic computer expert) were dressed in police tactical vests. (Id. at 13, 29-32.) Agent Adkins approached the front door of the residence, knocked loudly, and announced: "Police. Search warrant." (Id. at 11, 32-33.) The defendant quickly came to the door and opened it, wearing pajama bottoms and no shirt; Agent Adkins asked him to step out on the porch and explained that the officers were there to serve a federal search warrant. (Id. at 11, 13, 33.) He asked Mr. Wilson if there were any persons, animals or weapons in the house. (Id. at 11, 13.) The defendant responded that he was alone, and that there was a weapon in the home; he gave the weapon's location. (Id. at 11.) Agent Adkins and Detective Sergeant Kevin Morgan of the Paulding County Sheriff's Office waited on the porch with Mr. Wilson while other

---

[2] That number included two USPIS inspectors, two Georgia Bureau of Investigation ("GBI") agents, a GBI forensic computer specialist, and a detective sergeant and a uniformed deputy from the Paulding County Sheriff's Office. (Tr. 10-11.)

officers searched the house and secured the weapon. (Id. at 11-12.) Agent Adkins knew that Mr. Wilson was a school teacher with no criminal record. (Id. at 33.)

Once the house was swept and the property secured, Agent Adkins explained to the defendant that they were serving a federal search warrant and that he had the option to stay or leave. (Tr. 12). Agent Adkins also told Mr. Wilson that he would like the opportunity to interview him, but that he could decline the interview. (Id. at 12-13.) Agent Adkins also informed the defendant that, if he consented to an interview, his Miranda rights would be read to him, and the Agent would explain why he wanted an interview. (Id. at 13.) Agent Adkins also told the defendant that he was not under arrest and was free to leave. (Id.) The defendant said he would like to stay and speak with Agent Adkins. (Id.)

Thereafter, Agent Adkins, Sergeant Morgan, and the defendant moved from the porch to a table in the home's kitchen. (Tr. 13-14.) While seated at that table, Agent Adkins read the USPIS standard Warning and Waiver of Miranda Rights form to the defendant verbatim. (Id. at 14.) The form (No. 1067) reads as follows:

3

U.S. Postal Inspection Service
Warning and Waiver of Miranda Rights

Place: _____
   _____

Date: _____   Time: _____

### WARNING

BEFORE YOU ARE ASKED ANY QUESTIONS, YOU MUST UNDERSTAND YOUR RIGHTS.

- You have the right to remain silent.
- Anything you say can be used against you in court.
- You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning.
- If you cannot afford a lawyer, one will be appointed for you before any questioning, if you wish.
- If you decide to answer questions now without a lawyer, you will still have the right to stop answering questions at any time. You have the right to stop answering questions at any time until you talk to a lawyer.

I have read the statement of my rights (This statement of my rights has been read to me) and I understand what my rights are.

_____   _____   _____
   (Date)         (Time)            (Signature)

### WAIVER

I am willing to discuss subjects presented and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No

4

promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

_____     _____     _____
   (Date)             (Time)                    (Signature)

Witnessed by: _____
Title: _____
Witnessed by: _____
Title: _____

(Gov't Ex. 1; Tr. 15-16.)

After reading the form, Agent Adkins asked the defendant some questions to make sure that he understood it, such as whether he could read and write English (which he could), and his educational level (which was a master's degree). (Tr. 14, 34.) Agent Adkins also asked the defendant if he was under the influence of any drugs or other intoxicants; Mr. Wilson responded that he was not under the influence of anything that would affect his statements. (Id. at 14-15.) Agent Adkins then gave the form to the defendant to review. (Id. at 16.) The defendant appeared to read the form, and then signed it on the lines provided in both the warning and waiver sections at 6:11 a.m., about eleven minutes after the search team arrived. (Id.)[3]

---

[3] Sergeant Morgan and Agent Adkins executed the form as witnesses. (Gov't Ex. 1; Tr. 17.) Agent Adkins also filled in the blanks on the form for the place (160 Mary Lane, Dallas, Georgia), the date (3-26-2012), and the time (6:11 a.m.). (Gov't Ex. 1.) He also noted on the form the defendant's age (42), where and when he

5

After the defendant signed the form, Agent Adkins explained why the officers were there, and showed him portions of the search warrant affidavit containing invoice information from the DVDs shipped to the defendant's address. (Tr. 18.) Agent Adkins explained to the defendant that the DVDs and a digital download were ordered from, and received at, physical addresses and email addresses traced to him. (Id.) Agent Adkins then asked the defendant if he knowingly made those orders and received those movies. (Id.) The defendant confirmed that he knowingly ordered and received the DVDs and the digital download. (Id.)

Agent Adkins also asked the defendant about certain email addresses. (Tr. 18-20.) Mr. Wilson stated that he was the owner of some of the email addresses, but when Agent Adkins asked him about one of the email addresses, he replied that he would rather consult with a lawyer before answering. (Id.) As soon as the defendant stated that he would like to consult with an attorney, Sergeant Morgan noted the time on the form (6:31 a.m.), and Agent Adkins immediately ended the interview. (Id. at 19-20; see also Gov't Ex. 1.) Their initial conversation had lasted approximately twenty minutes. (Tr. 20.)

---

obtained a master's degree (West Georgia College in 1996), and the words "no intoxicants," to record defendant's response that he was not under the influence of any drugs or alcohol. (Id.)

6

Agent Adkins then explained to the defendant that the search was ongoing, and that he was free to leave or stay, but that if he stayed, he should remain in one location in the house for safety's sake. (Tr. 19.) The defendant said he wanted to stay. (Id.) When asked where he would like to stay, the defendant replied that he would like to sit on the couch. (Id.) Agent Adkins then asked Mr. Wilson if he needed anything, at which point the defendant asked for a sweatshirt and some socks, which were retrieved for him. (Id.)[4]

About forty minutes after the first interview had concluded (or at about 7:17 a.m.), the defendant re-engaged with Sergeant Morgan and asked to again speak to Agent Adkins. (Tr. 21-22; see also Gov't Ex. 1.) Sergeant Morgan relayed that request to Agent Adkins, who came over to the couch where the defendant was sitting and explained that, since he had asked for an attorney, he (Adkins) did not want to interview him further. (Tr. 21.) When Agent Adkins asked the defendant what he wanted to say, Mr. Wilson replied that he had never molested a child, and that the

---

[4] Elsewhere in the record, it appears that Mr. Wilson did not ask for additional clothing until 7:38 a.m., or about ninety minutes after the search began. (Tr. 35.) This discrepancy between twenty minutes and ninety minutes is not material, because as discussed infra in the text following note 7, there is no evidence that the officers were responsible for the defendant's lack of clothing or that they denied any request for additional clothing. Indeed, there is no reason that Mr. Wilson could not have asked for additional clothing immediately if he had wanted it.

7

materials he had ordered did not contain sex. (Id.) Agent Adkins again informed the defendant that since he had invoked his right to an attorney, he (Adkins) did not want to interview him, but that the defendant could write a statement. (Id.) Agent Adkins made clear to the defendant that, if he wrote a statement, it would be of his own choosing and not under compulsion or coercion. (Id.) Agent Adkins also told Mr. Wilson that he would read any statement provided, and that if the defendant wanted to discuss anything, except the email address that had caused him to invoke his rights, Agent Adkins would speak with him, as long as he signed another Warning and Waiver of Miranda Rights form reflecting the current time. (Id.)

At this point the defendant wrote a statement (Gov't Ex. 3), which Agent Adkins read back to him to confirm that it was complete and accurate (Tr. 21-23). Agent Adkins then asked the defendant if he wanted to talk, because if he did, it would be necessary for him to sign another waiver form, but that under no circumstance would Agent Adkins ask him about the email address. (Id. at 22.) Agent Adkins then gave the defendant a blank Warning and Waiver of Miranda Rights form, asked him if he understood the Miranda rights, and had him review the form

8

again. (Id. at 25.) Mr. Wilson agreed that he understood his rights and signed a second form at 7:38 a.m., witnessed again by Sergeant Morgan and Agent Adkins. (Gov't Ex. 2; Tr. 22, 25-26.)[5] Agent Adkins then questioned Mr. Wilson further, but for less than an hour. (Tr. 26-27.) At no point during this second interview did the defendant ask for a lawyer or invoke his right to remain silent. (Id. at 27-28.)

During this entire episode, all of the agents and officers had their firearms visible but holstered. (Tr. 14, 37-38.) No one ever threatened the defendant or made

---

[5] Mr. Wilson also signed the statement he had written at 7:38 a.m., which Sergeant Morgan and Agent Adkins witnessed (Gov't Ex. 3; Tr. 24.)

any promises to him.  (Id. at 28.)  The defendant was also never handcuffed or restrained in any way.  (Id.)

## II.   THE INDICTMENT

On July 24, 2012, the Grand Jury returned a two-count Indictment [1] against Mr. Wilson.  Count One charges that, on or about February 8, 2011, and March 3, 2011, in the Northern District of Georgia, the defendant knowingly received one or more visual depictions of minors engaging in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2), said depictions having been (a) produced using minors engaging in sexually explicit conduct, and (b) shipped and transported in interstate and foreign commerce, by any means, including by United States mail and by computer, all in violation of 18 U.S.C. § 2252(a)(2) and (b)(1).  (Indictment 1.)

Count Two of the Indictment alleges that, beginning on a date unknown to the Grand Jury, but at least by March 26, 2012, in the Northern District of Georgia, the defendant knowingly possessed a Dell laptop computer that contained one or more visual depictions of minors engaging in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2), said depictions having been (a) produced using minors engaging in sexually explicit conduct, and (b) shipped and transported in interstate and foreign

10

commerce, by any means, including by computer, all in violation of 18 U.S.C. § 2252(a)(4)(B) and (b)(2).  (Indictment 1-2.)

In sum, Count One arises from the defendant's ordering of alleged child pornography from the Canadian movie production company in February-March 2011, while Count Two arises from the defendant's possession of alleged child pornography on his Dell laptop computer, which agents seized on March 26, 2012, when executing the federal search warrant at his residence.

### III.   LEGAL ANALYSIS

The Supreme Court in Jackson v. Denno, 378 U.S. 368, 376-77 (1964), held that a defendant has a constitutional right to a fair hearing and an independent and reliable determination of the voluntariness of a confession before it is allowed to be heard by a jury.  Title 18 U.S.C. § 3501(a) codifies the Jackson v. Denno requirement for criminal prosecutions and provides that, before a confession or self-incriminating statement is received in evidence, "the trial judge shall, out of the presence of the jury, determine any issue as to voluntariness."  United States v. Davidson, 768 F.2d 1266, 1270 n.1 (11th Cir. 1985) (internal quotation marks omitted).

A two-part inquiry determines the admissibility of a confession or self-incriminating statement.  First, the Court must consider whether the Government

complied with the requirements of Miranda, 384 U.S. at 436. United States v. Jones, 32 F.3d 1512, 1516 (11th Cir. 1994) (per curiam); United States v. Sims, 719 F.2d 375, 378 (11th Cir. 1983) (per curiam). Second, if those requirements were met, the Court must consider whether the confession or self-incriminating statement was voluntary. Jones, 32 F.3d at 1516; Sims, 719 F.2d at 378. The Court makes these inquiries separately below.

### A.   **Compliance with *Miranda***

In Miranda, the Supreme Court noted that, "when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized." 384 U.S. at 478. Therefore, the Court held that the procedural safeguard of warning the suspect of his constitutional rights must be instituted to protect the privilege. Id. at 478-79. These so-called Miranda warnings "are required before any statement may be admitted into evidence at trial which was elicited from a person in custody through interrogation." Endress v. Dugger, 880 F.2d 1244, 1248 (11th Cir. 1989).

The testimony at the hearing showed that Agent Adkins carefully advised Mr. Wilson of his Miranda rights, allowed him to review the USPIS Warning and Waiver of Miranda Rights form, and confirmed that he understood his rights. At that point,

12

Mr. Wilson executed the form. Therefore, the undisputed evidence shows that the defendant received notice of his rights <u>before</u> he was subjected to interrogation and made any incriminating statements.[6] Accordingly, law enforcement complied with the dictates of <u>Miranda</u>.

### B. <u>Voluntariness</u>

Determining whether a confession or incriminating statement is voluntary depends on whether, under all of the surrounding circumstances, the statement was the product of the accused's "free and rational" choice. <u>Jones</u>, 32 F.3d at 1516. In <u>Arizona v. Fulminate</u>, 499 U.S. 279, 285-88 (1991), the Court held that the issue of voluntariness is determined by the totality of the circumstances. In evaluating the totality of the circumstances, the district court must assess whether law enforcement

---

[6] The entitlement to <u>Miranda</u> rights does not attach until custodial interrogation begins. <u>United States v. Luna-Encinas</u>, 603 F.3d 876, 880 (11th Cir. 2010). A person who is free to leave in a given situation is not "seized" by law enforcement, and "[s]eizure is a necessary prerequisite to *Miranda*." <u>Id.</u> at 881. Because Mr. Wilson was explicitly informed at the outset of the search warrant's execution that he was free to leave at any time, he was never seized, and officers were not compelled to give him <u>Miranda</u> warnings. <u>See</u> <u>id.</u> at 882. ("Because [the defendant] was not in 'custody' when he made the statements leading to the discovery of the firearm, the officers were under no obligation to advise him of his Miranda rights."). Nevertheless, the officers advised Mr. Wilson of his <u>Miranda</u> rights.

13

conduct was "causally related" to the confession. Jones, 32 F.3d at 1516-17 (internal quotation marks omitted).

Several non-exhaustive factors help assess voluntariness, including "the defendant's intelligence, the length of his detention, the nature of the interrogation, the use of any physical force against him, or the use of any promises or inducements by the police." Hubbard v. Haley, 317 F.3d 1245, 1253 (11th Cir. 2003). While the Eleventh Circuit has "enumerated a number of (non-exclusive) factors that may bear on the issue of voluntariness, the absence of official coercion is a *sine qua non* of effective consent." United States v. Gonzalez, 71 F.3d 819, 828 (11th Cir. 1996) (internal quotation marks and citation omitted). A "signed Miranda waiver is usually strong evidence that the defendant waived his rights." United States v. Bernal-Benitez, 594 F.3d 1303, 1319 (11th Cir. 2010).

In this case, the Court finds that the defendant is intelligent, holding a master's degree. The defendant was not formally arrested, detained, or even seized (see supra note 6), and it was only eleven minutes between his first encounter with law enforcement and his execution of the waiver. His interrogation was polite and non-confrontational, with only two officers talking to the defendant at his kitchen table. No guns were drawn, no physical force was used against the defendant, and no

14

promises or inducements were extended. As shown by the form that he executed, Mr. Wilson was aware of his rights and of the consequences of relinquishing those rights.

The defendant's primary argument is that, because he was awakened early by armed men, and because he wore no shirt and socks while being questioned, he was coerced into signing the waiver form, thus rendering his statements involuntary. (Def.'s Br. 5.) This argument fails. Officers came to his home early (i.e., 6:00 a.m.), but if Mr. Wilson had been asleep, he would not have asleep much longer on a Monday morning as he was a schoolteacher. Although the officers were armed and wearing tactical vests, they never brandished their weapons or threatened the defendant with them.

Moreover, Mr. Wilson elected to answer his front door without putting on a shirt or socks. The officers kept him outside only as long as necessary to complete a sweep of the house, and then moved him back inside.[7] There is no evidence in the record that the defendant was cold or uncomfortable. But, even if he had been, there is no

---

[7] The defendant argues that it was humiliating for him to stand outside wearing only his pajama bottoms in full view of his neighbors. (Def.'s Br. 5, citing Tr. 20.) However, at the page of the record cited, the defendant was inside his home, and Agent Adkins had already terminated the first interview. Although a neighbor had stopped by to see what was going on, Agent Adkins had spoken to him. There simply is no evidence that this neighbor saw Mr. Wilson standing on the front porch in his pajama bottoms or that he even saw Mr. Wilson at all.

15

evidence that the agents exploited that alleged discomfort. Indeed, as soon as Mr. Wilson requested additional clothing, it was provided to him. The Court agrees with the Government that any pressure resulting from the defendant's state of undress did not flow from police conduct. (Gov't Resp. 11.) In sum, there is simply no evidence here of police coercion.[8]

As the Supreme Court stated in Berkemer v. McCarty, 468 U.S. 420 (1984), "cases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that law enforcement authorities adhered to the dictates of Miranda are rare." Id. at 433 n.20. Because law enforcement authorities here adhered to the requirements of Miranda, and, for the reasons just explained, this is not one of those rare case where a defendant can make a colorable argument that a self-incriminating statement was compelled. Therefore, the undersigned **REPORTS** that, under the totality of the circumstances, the defendant made a free and rational choice to relinquish his Miranda rights and provide statements to Agent Adkins on March 26, 2012.

---

[8] The defendant argues that, because the initial questioning was invalid, the written statement and the oral statements that he gave to Agent Adkins in the second interview are inadmissible as "fruit of the poisonous tree." (Def.'s Br. 11-12.) This argument fails because, as shown above, the defendant made a valid waiver of his Miranda rights. Therefore, any subsequent statements are also admissible.

16

## IV.   CONCLUSION

For the reasons stated above, the undersigned **RECOMMENDS** that Defendant's Motion to Suppress Statements [19] be **DENIED**.

**SO RECOMMENDED,** this 25th day of March, 2013.

_____
WALTER E. JOHNSON
UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev.8/82)